### UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND

THOMAS P. JOHNSON, III,

     Plaintiff,

     v.

LARRY HOGAN,
*Governor of Maryland,*

     Defendant.

Civil Action No. TDC-22-2250

### MEMORANDUM OPINION

Plaintiff Thomas P. Johnson, III, an attorney who resides in and practices in Montgomery County, Maryland, has filed a self-represented civil action against Defendant Larry Hogan, the Governor of Maryland, alleging violations of his constitutional rights under the First, Fourteenth, and Fifteenth Amendments to the United States Constitution arising from a 2020 amendment to Maryland election laws which prevents him, as a candidate defeated in the primary election, from registering as a recognized write-in candidate in the November 2022 general election for the position of a judge of the Circuit Court for Montgomery County. Presently pending before the Court is Johnson's Motion for a Preliminary Injunction, which is fully briefed. On October 4, 2022, the Court held a hearing on the Motion. For the reasons set forth below, the Motion will be DENIED.

### BACKGROUND

Johnson, who has been an attorney for almost 30 years, seeks to become a judge of the Circuit Court for Montgomery County. Under the Maryland Constitution, judges of the Maryland circuit courts are elected to 15-year terms by the voters of the relevant county. Md. Const. art. IV,

§ 3. However, when a judicial vacancy on a circuit court arises, the Governor of Maryland has the authority to appoint a new judge to that court. *Id.* § 5. If the vacancy occurred other than by the expiration of a 15-year term, the appointed judge holds the position until the next general election at which members of the United States House of Representatives are to be elected, provided one year has passed since the vacancy occurred. *Id.* At that point, the appointed judge, as well as other candidates, may seek election to a new 15-year term as a circuit court judge. *See id.*

Prior to a general election, Maryland holds primary elections through which the two major political parties select nominees for elected public offices. Md. Code Ann., Election Law § 8–202(a) (LexisNexis 2022). For the election of judges of the Maryland circuit courts, the primary process is "neither purely partisan nor purely nonpartisan." *Ademiluyi v. Egbuonu*, 215 A.3d 329, 335 (Md. 2019). In both the Democratic and Republican primary elections, candidates for the position of judge of the local Maryland circuit court appear on the ballot. *See id.* at 345. However, unlike most candidates for a political party's nomination, who must be "a registered voter affiliated with the political party," judicial candidates need not be affiliated with the relevant political party, and no party affiliation is listed on the ballot next to their names. Md. Code Ann., Election Law § 5–203(a)(2), (b); *id.* § 9–210(g)(3). Judicial candidates often appear on both parties' primary ballots. *See Suessmann v. Lamone*, 862 A.2d 1, 8 (Md. 2004). Judicial candidates who win the primary election of either major party are entitled to be placed on the general election ballot. *See id.* at 7.

As of the 2020 general election, the Election Law Article of the Maryland Code included a statute that imposed certain restrictions on potential candidates for public office who were defeated in a primary election, sometimes referred to as a "sore-loser law." *See* Md. Code Ann., Election Law § 5–706 ("section 5–706"). As relevant here, the law provided that "[t]he name of

2

a candidate for the office of judge of the circuit court who is defeated in the primary election in each contest for the office of circuit court judge in which the candidate appears on the ballot may not appear on the ballot at the succeeding general election as a candidate for any office." *Id.* § 5–706(c). However, the Maryland "sore-loser law" did not prevent a defeated primary candidate, including a candidate for a circuit court judge position, from running as a write-in candidate in the general election. *See id.* Upon the filing of a valid certificate of candidacy, an individual could be deemed a recognized "write-in candidate" for the relevant office. *Id.* § 5–301(e). The filing of such a certificate entitles a recognized write-in candidate to have the Maryland Board of State Canvassers tabulate that candidate's votes. Maryland State Board of Elections, *Summary Guide: Maryland Candidacy and Campaign Finance Laws* § 2.3 (2022), *available at* https://elections.maryland.gov/campaign_finance/documents/Summary_Guide_2022.pdf (last visited Oct. 12, 2022) ("Md. Bd. of Elections Summary Guide").

In 2020, Johnson ran in the Maryland primary election for a position as judge of the Circuit Court for Montgomery County against other candidates, including four incumbent judges previously appointed by Governor Hogan. After he lost the primary election, Johnson, consistent with the Maryland election laws, filed a certificate of candidacy with the Maryland Board of Elections (the "Board") and actively campaigned as a write-in candidate in the general election. Johnson was not elected.

In May 2020, the Maryland General Assembly passed an amendment to section 5–706. The provision stated that, with an effective date of January 1, 2021, "[a] candidate who is defeated for the nomination for a public office may not file a certificate of candidacy as a write-in candidate at the next succeeding general election as a candidate for any office." Md. Code Ann., Election Law § 5–706(b)(2). Applying to all candidates for public office, section 5–706(b)(2) effectively

3

prevents any candidate who loses a primary election from running in the general election as a write-in candidate, because in the absence of a certificate of candidacy, the Maryland Board of State Canvassers will not count the candidate's write-in votes. Md. Bd. of Elections Summary Guide § 2.3.

In July 2022, Johnson again was a candidate on the ballot in the primary election for the position of a judge of the Circuit Court for Montgomery County. The other candidates consisted of four incumbent judges who had been previously appointed by Governor Hogan to that circuit court ("the sitting judges") and an attorney, Marylin Pierre. The sitting judges proved to be the four candidates who received the most votes and thus advanced to the general election.

As in 2020, Johnson planned to campaign and run in the 2022 general election as a write-in candidate. However, after asking the staff of the Board about filing a certificate of candidacy, Johnson was informed on July 26, 2022 that as result of the newly enacted section 5–706(b)(2), he is not permitted to file a certificate of candidacy because he lost in the primary election.

On September 7, 2022, Johnson filed the present action in this Court. In the Complaint, Johnson asserts that the new prohibition on defeated primary candidates filing a certificate of candidacy for the general election violates the First, Fourteenth, and Fifteenth Amendments. First, Johnson alleges that section 5–706(b)(2) violates the First Amendment because it "impinge[s]" on his "freedom to campaign for public office" and is a prior restraint on free speech in that by denying access to the ballot, it "silence[s] the voices of write-in candidate challengers" to the judges appointed by Governor Hogan. Compl. ¶ 48, ECF No. 1.

Second, Johnson alleges that this provision violates the Equal Protection Clause of the Fourteenth Amendment (1) by imposing disparate treatment between appointed judges and other candidates; and (2) where there are no Black male judges on the Circuit Court for Montgomery

4

County, and there were none among the sitting judges, by maintaining a "racially [and] gender based segregated circuit court." Compl. ¶ 87.

Finally, Johnson alleges that section 5-706(b)(2) violates the Fifteenth Amendment, which guarantees that the right to vote will not be denied "on account of race," U.S. Const. amend. XV, because denying Johnson, a Black male candidate, the opportunity to challenge the four sitting judges denies voters their right to vote, and to choose a candidate, on account of race.

With the Complaint, Johnson also filed a Motion for a Preliminary Injunction, which is now fully briefed.

## DISCUSSION

In his Motion, Johnson seeks a preliminary injunction requiring Defendant to allow Johnson to file a certificate of candidacy as a write-in candidate and to have his name placed on the ballot with a "write-in candidate" designation. Mot. at 29, ECF No. 2. Johnson notes that the deadline to file such a certificate of candidacy is October 20, 2022. In opposing the Motion, Defendant argues that (1) Johnson lacks standing to assert his claims; (2) he is not likely to succeed on the merits; (3) he is not likely to suffer irreparable harm; and (4) the balance of equities and the public interest are not in Johnson's favor.

## I.      Legal Standard

To obtain a preliminary injunction, moving parties must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). Because a preliminary injunction

is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

## II.     Standing

As an initial matter, Defendant argues that Johnson lacks standing to assert his claims because he did not file a certificate of candidacy for the 2022 general election and thus has not yet suffered an injury, no potential injury is traceable to Governor Hogan, and the Court "cannot redress any alleged harm because none has yet happened." Opp'n at 11, ECF No. 7.

Because Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies," plaintiffs in federal civil actions must demonstrate standing to assert their claims. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" requirements of standing consist of three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) the injury must be fairly traceable to the actions of the defendant; and (3) it must be "likely" that the injury will be "redressed by a favorable decision." *Id.* at 560–61 (citations omitted).

Here, Johnson has suffered an injury in fact. An injury in fact must be "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). Johnson has alleged a concrete injury particularized to him: he alleges that because the Board has informed him that it will refuse to accept his certificate of candidacy for the 2022 general election, he is effectively barred from running for the position of circuit court judge as a write-in candidate.

The injury is also sufficiently actual or imminent. The purpose of the imminence requirement "is to ensure that the alleged injury is not too speculative for Article III purposes." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017). Although Defendant

6

is correct that Johnson did not actually attempt to file a certificate of candidacy, and thus has not yet had his certificate formally denied, a plaintiff may challenge the prospective operation of a statute when there is "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298–99 (1979). A plaintiff need not "await the consummation of threatened injury to obtain preventive relief"; rather an "impending" injury is sufficient. *Id.* As Johnson's email exchange with the Board demonstrates, the Board specifically informed him that he "cannot file as a Write-In Candidate in the General Election" because he lost in the primary election. Email at 1–2, Compl. Ex. 2, ECF No. 1-3. Indeed, as Defendant's counsel acknowledged in the memorandum in opposition to the Motion, and confirmed during the hearing on the Motion, if Johnson files a certificate of candidacy and pays the $50 filing fee, "the Board will almost certainly reject his certificate." Opp'n at 12. Johnson has therefore sufficiently alleged an imminent, impending injury arising from the operation of section 5–706(b)(2) because any filing of a certificate, which he is fully prepared to submit and would need to submit to be a recognized write-in candidate in the November 2022 general election, will be denied, and he will be barred from running as a write-in candidate.

As for whether the injury is fairly traceable to the actions of the defendant, Johnson alleges that, as a matter of causation, Governor Hogan is partially responsible for section 5-706(b)(2), which was passed by the General Assembly during his term of office. Defendant acknowledges that although Governor Hogan did not sign the statute, he had the opportunity to veto it and did not do so. Moreover, Johnson alleges that Governor Hogan's appointments of the sitting judges, who are not Black men, have contributed to the equal protection violation he claims to have resulted from the enactment and application of the statute. Although Defendant asserted at the

7

hearing on the Motion that if there is a proper defendant, it would be the Board, not the Governor, the question of whether Johnson has stated a legally valid claim for relief against the Governor is a different question. At this point, the Court finds only that Johnson has sufficiently alleged that his injury is fairly traceable to the Governor's actions to meet the requirement for standing.

Finally, redressability is satisfied because if Johnson were to prevail on his claim that section 5–706(b)(2) is unconstitutional, his injury of not being able to run as a write-in candidate could be redressed by an injunction requiring that he be permitted to file a certificate of candidacy. The Court therefore finds standing and will address the merits of the Motion.

## III.   Likelihood of Success on the Merits

In order to prevail on the Motion, Johnson must show a likelihood of success on the merits of at least one of his claims, which consist of claims under the First, Fourteenth, and Fifteenth Amendments to the Constitution. The Court will discuss each in turn.

### A.      First Amendment

Johnson first argues that section 5–706(b)(2) violates his First Amendment rights in that it infringes on his right to campaign for public office and is a prior restraint on free speech. The United States Supreme Court has addressed the standard by which to assess a First Amendment challenge to state law restrictions relating to the operation of elections, including those relating to the eligibility of candidates. In *Burdick v. Takushi*, 504 U.S. 428 (1992), the Supreme Court reaffirmed the longstanding principle that the States generally have the power to regulate their own elections, and that such regulation is necessary to have "fair and honest" elections. *Id.* at 433 (citing U.S. Const. art. I, § 4, cl. 1). At the same time, the Court acknowledged that state election laws and regulations can implicate First and Fourteenth Amendment rights such as "the individual's right to vote and [the] right to associate with others for political ends." *Id.* at 433–34;

8

*see Pisano v. Strach*, 743 F.3d 927, 932 (4th Cir. 2014) (stating that ballot-access restrictions "implicate substantial voting, associational and expressive rights protected by the First and Fourteenth Amendments" (citation omitted)). However, recognizing that state election laws "invariably impose some burden upon individual voters," the Court concluded that "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433. Accordingly, the Court held that "the mere fact" that a state's election laws create "barriers . . . tending to limit the field of candidates from which voters might choose . . . does not of itself compel close scrutiny." *Id.* (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)).

Thus, the Supreme Court directed that courts are to apply "a more flexible standard" when analyzing whether state election laws impermissibly infringe on First and Fourteenth Amendment rights under which they are to weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," while also "taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). If the burden on First and Fourteenth Amendment rights is "severe," the regulation "must be narrowly drawn to advance a state interest of compelling importance," but if the regulation "imposes only reasonable, nondiscriminatory restrictions" on such constitutional rights, "the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (citations omitted).

9

Applying this standard, the *Burdick* Court upheld the constitutionality of Hawaii's state election law that entirely banned write-in candidates and write-in votes. *Id.* at 440. Notably, the Court found that a ban on write-in voting imposed only a "limited burden" on First Amendment rights, such that no compelling interest needed to be established, and that the Hawaii ban was justified by state interests which included avoiding "unrestrained factionalism at the general election," "averting divisive sore-loser candidacies," and, at the primary stage, "guard[ing] against party raiding," the practice of "organized switching of blocs of voters from one party to another in order to manipulate the outcome" of the primary. *Id.* at 439. Where the Supreme Court has held that a state may permissibly bar write-in candidates and write-in voting, Johnson's constitutional challenge to Maryland's prohibition on defeated primary candidates running as recognized write-in candidates is unlikely to succeed on the merits.

While *Burdick* differed from the present case in that it addressed a general ban on write-in candidates rather than a ban focused on defeated primary candidates, the fact that section 5–706(b)(2) is targeted at defeated primary candidates does not alter the analysis. It is firmly established that States may restrict ballot access to defeated primary candidates through "sore-loser" laws and provisions. In *Backus v. Spears*, 677 F.2d 397 (4th Cir. 1982), the United States Court of Appeals for the Fourth Circuit upheld such a "sore-loser" provision when it rejected a constitutional challenge to a South Carolina law that was invoked to bar a city council candidate who was defeated in a primary election from running in the general election, even though he submitted a petition that otherwise met all the necessary requirements. *Id.* at 398–99. The court held that the challenge was "frivolous" because South Carolina "certainly has the power, as a permissible adjunct to promoting orderly primary elections, to forbid petition candidacies by persons who have been defeated in party primaries," as such action promoted "the legitimate state

10

interest in the stability of [the] political system." *Id.* at 399–400. Although the challenge was brought by voters asserting the right to have the candidate of their choice on the ballot, the court noted that there was no persuasive distinction between such a challenge and one brought by candidates asserting their own constitutional rights. *See id.* at 400.

Similarly, in *Storer v. Brown*, 415 U.S. 724 (1974), the Supreme Court upheld as constitutional a California state law restriction that barred an individual from being placed on the general election ballot as an independent candidate unless that individual had had no affiliations with one of the political parties for the past 12 months. *Id.* at 735–36. In so ruling, the Court equated the restriction to a related California sore-loser law barring a candidate defeated in the primary from running in the general election as an independent, which the Court deemed to serve similar interests in that it was aimed at ensuring that the primary election served to resolve differences among those eligible to run in the primary and prevent members of the same party from "continuing the struggle" in the general election. *Id.* at 735. Relying on *Storer*, the Fourth Circuit in *Backus* specifically found that a state or local government "may constitutionally refuse to accept an otherwise valid petition that seeks to place the name of a defeated primary candidate on the general election ballot." *Backus*, 677 F.2d at 400.

Where election laws barring write-in candidates and those prohibiting defeated primary candidates from running in the general election have both been deemed constitutional, Johnson's challenge to section 5–706(b)(2), which bars defeated primary candidates from running as write-in candidates, would undoubtedly fail. *See Burdick*, 504 U.S. at 439–41; *Backus*, 677 F.2d at 399–400. Under the flexible standard of *Burdick*, because the statute is a reasonable, nondiscriminatory restriction in that it is generally applicable to any defeated primary candidate, whether a sitting judge or not, the statute imposes only a limited burden and thus will be upheld if the State has

11

"important regulatory interests" for adopting it. *Burdick*, 504 U.S. at 434. As Defendant has argued, some of the same or similar state interests at issue in *Burdick* and *Backus* are applicable here. For example, by preventing defeated primary candidates from running in any way in the general election, section 5–706(b)(2) serves the purposes of allowing a state to impose "some sort of order" over state elections by allowing primaries actually "to winnow out and finally reject all but the chosen candidates," such that the general election ballot can be reserved "for major struggles" rather than "continuing intraparty feuds." *Burdick*, 504 U.S. at 433, 438–39. The rule also serves the purposes of "averting divisive sore-loser candidacies" and "unrestrained factionalism at the general election." *Id.* at 439. These interests all serve the broader "legitimate state interest in the stability of [the] political system." *Backus*, 677 F.2d at 399–400.

Accordingly, pursuant to *Burdick* and *Backus*, the Court finds that Johnson is unlikely to succeed on the merits of his First Amendment claims.

**B.    Fourteenth Amendment**

Johnson also asserts that section 5–706(b)(2) violates the Equal Protection Clause of the Fourteenth Amendment under two theories: (1) by imposing disparate treatment in favor of the sitting judges and against other candidates like him; and (2) because the adoption of the statute was intended to protect Governor Hogan's appointed judges in a racially discriminatory manner. "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). "Ordinarily, a state regulation or policy will be presumed to be valid and will be sustained if the classification is

rationally related to a legitimate state interest," commonly known as the rational basis test, but it will be subjected to strict scrutiny if the regulation or policy classifies by a protected class such as race, alienage, or national origin, under which it must be "narrowly tailored to serve a compelling state interest." *Id.*

### 1. Disparate Treatment

As to the argument of disparate treatment in favor of the sitting judges, section 5–706(b)(2) does not classify candidates by race, alienage, or national origin, and the category of appointed, incumbent judges is not a protected class, so the rational basis test applies. *See Morrison*, 239 F.3d at 654. As discussed above, section 5–706(b)(2) serves several legitimate state interests, including interests in allowing a state to impose order and stability over state elections by winnowing out defeated candidates, avoiding divisive candidacies advanced by defeated candidates, and avoiding "unrestrained factionalism" at the general election. *Burdick*, 504 U.S. at 439; *see supra* part III.A. The rational basis test is thus satisfied.

Moreover, the Court notes that section 5–706(b)(2) does not even favor sitting judges over other candidates. Its text is neutral and applies to all candidates for political offices: it makes no reference to judges, or incumbent candidates, but instead imposes restrictions broadly on candidates "who [are] defeated for the nomination for a public office" in a primary election. Md. Code Ann., Election Law § 5–706(b)(2). Indeed, had Johnson received sufficient votes in the July 2022 primary election to advance to the general election, and had any particular sitting judge failed to so qualify, the sitting judge would have been prohibited from filing a certificate of candidacy just as Johnson currently is prohibited from doing so. Thus, the Court finds that Johnson is unlikely to succeed on his equal protection challenge based on disparate treatment of sitting judges as compared to other candidates.

### 2.     Race and Sex Discrimination

Construed liberally, Johnson's other equal protection claim is that section 5–706(b)(2) imposes a discriminatory classification based on race and sex because it was enacted to protect the sitting judges from electoral challenge, and Governor Hogan's appointments to the Circuit Court for Montgomery County have not included any Black men, so it was either intended to, or has the effect of, preventing Black male candidates from securing election as circuit court judges.

When considering a challenge to a state law under the Equal Protection Clause, courts first consider whether the state law is facially neutral. *See Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 819 (4th Cir. 1995). Here, section 5–706(b)(2) does not impose any classifications based on the race or sex of candidates or prospective candidates and, in fact, makes no reference to race or sex, applies to all positions for elected office, and is not limited to judicial positions generally or circuit judge positions in Montgomery County specifically. *See* Md. Code. Ann., Election Law § 5–706(b)(2) ("A *candidate who is defeated for the nomination for a public office* may not file a certificate of candidacy as a write-in candidate at the next succeeding general election as a candidate for any office." (emphasis added)).

A facially neutral law could still violate equal protection rights based on race or sex, but the plaintiff must show that there was intentional discrimination on that basis. *Sylvia Dev. Corp.*, 48 F.3d at 825. "[A] showing of clear and intentional discrimination" is required even if the enforcement of the facially neutral law has a "racially disproportionate impact." *Id.* (quoting *Washington v. Davis*, 426 U.S. 229, 239 (1976)); *see also Snowden v. Hughes*, 321 U.S. 1, 8 (1944) (holding that "[t]he unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful

discrimination"). The plaintiff has the initial burden of proving such intentional discrimination. *See Sylvia Dev. Corp.*, 48 F.3d at 819.

At the hearing on the Motion, Johnson asserted that one of the reasons he has run and continues to seek to run for the position of a judge of the Circuit Court for Montgomery County is the lack of Black male judges on that court and the fact that Black males represent a disproportionately high percentage of criminal defendants in Montgomery County. Johnson's belief that diversity on the bench of the Circuit Court for Montgomery County is an important goal, and his concern about insufficient diversity among the judges on that court generally and those appointed by Governor Hogan specifically, are undoubtedly sincere and raise issues of significant public concern. At this stage, however, Johnson has not provided sufficient facts to show that he is likely to succeed in demonstrating discriminatory intent in the Governor's appointments. His allegation that Governor Hogan has engaged in a "subjective process" that "has kept well qualified African-American males off the bench," coupled with his recitation of statistics about the lack of Black male judges on the Circuit Court for Montgomery County, at best might show a likelihood of being able to demonstrate a disparate impact in the results of the appointments process. Compl. ¶ 14. A disparate impact, however, is insufficient to establish an equal protection claim based on race discrimination. *Washington v. Davis*, 426 U.S. 229, 239 (1976).

Moreover, the appointments process with which Johnson takes issue is not governed by section 5–706(b)(2); it is set forth in the Maryland Constitution, Md. Const. Art. IV, § 5, which is not the subject of Johnson's challenge. Where Johnson seeks to enjoin the enforcement of section 5–706(b)(2) as unconstitutional, he must demonstrate that the statute was enacted or is enforced with discriminatory intent. In his Complaint and Motion, Johnson makes no assertions, and provides no evidence, of discriminatory intent on the part of the Maryland General Assembly in

15

enacting section 5–706(b)(2) or by the Board in enforcing the statute. Because Johnson has not demonstrated that he has been, or will be, able to establish intentional discrimination, the Court finds that he is unlikely to succeed on the merits of his equal protection claim based on race discrimination.

### C.      Fifteenth Amendment

Finally, for many of the same reasons, the Court finds that Johnson is unlikely to succeed on his claim under the Fifteenth Amendment, which provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend XV. Johnson asserts that section 5–706(b)(2), by having the effect of preventing him from registering as a recognized write-in candidate, infringes on the Fifteenth Amendment by effectively depriving Montgomery County voters from having the option to vote for a Black male candidate for the circuit judge position. Johnson cites no legal authority supporting such a claim, and the Court has not identified any. The Court therefore concludes that Johnson is unlikely to succeed on this claim.

### IV.     Other Elements

A party moving for a preliminary injunction must satisfy each of the four requirements for a preliminary injunction. *See Pashby*, 709 F.3d at 320. Because the Court finds that Johnson is not likely to succeed on the merits of any of his claims, it need not and does not address the remaining elements of irreparable harm, the balance of the equities, and the public interest.

## CONCLUSION

For the foregoing reasons, Johnson's Motion for Preliminary Injunction will be DENIED.

A separate Order shall issue.

Date: October 13, 2022

THEODORE D. CHUANG
United States District Judge